UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| CONRAD PRESTON, | ) | Civ.  06-5051-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER REVERSING |
| vs. | ) | AND REMANDING |
| | ) | COMMISSIONER'S |
| MICHAEL J. ASTRUE, Commissioner, | ) | DECISION |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Conrad Preston, moves for reversal of the Commissioner of

Social Security's ("Commissioner") decision denying his application for

disability insurance benefits and supplemental security income under Titles II

and XVI of the Social Security Act.  Defendant opposes the motion.  The court

reverses and remands the Commissioner's decision denying benefits for the

reasons stated below.

**PROCEDURAL BACKGROUND**

Preston filed an application for benefits alleging a disability onset date

of June 13, 2003.  AR 69.[1]  The application was initially denied and again

upon reconsideration.  Preston then requested a hearing before an

Administrative Law Judge (ALJ).  AR 67.  After a hearing, Jon L. Lawritson

determined that Preston was not disabled, and thus, he was not entitled to

---

[1] All citations to "AR" refer to the appropriate page of the administrative
record found at Docket 5.

benefits.  AR 15-21.  The Appeals Council denied Preston's request for review, and thus, the ALJ's decision is the "final decision" under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Preston is 56 years old.  AR 69. He graduated from high school and obtained a vocational degree in architectural drafting.  AR 79.  Preston worked from 1988 through June of 2003 as an auto maintenance technician, a quality control building inspector, a building maintenance technician, a gaming cashier, and an advertising materials distributor.  AR 74.

In 1993, while working as a building maintenance technician for Lead-Deadwood School District, Preston developed a severe burning pain in his neck, shoulders, and over most of his muscles.  AR 74, 125, 146.  Preston reported that the pain prevented him from sleeping, sometimes for days.  AR 146.  Preston stated that he was seen by several physicians, a physical therapist, a chiropractor, and a massage therapist.  Id.  Preston was prescribed Amitriptyline, which reduced his pain by 75 percent.  Id.

In August of 1994, Preston began receiving treatment from Robert C. Finley, M.D.  Preston sought treatment for pain, fatigue, and stiffening in his upper extremities.  AR 165.

In 1995, Preston quit working for the Lead-Deadwood School District. AR 125.  Preston indicates that he quit because his pain prevented him from performing the job.  AR 192.  Preston then tried several different jobs.  AR 84, 124, 141.

2

On April 14, 1997, Preston was evaluated by Cynthia Anderson Weaver, M.D., a rheumatologist.  AR 146-47.  Physical examination indicated a good range of motion but the presence of trigger points.  AR 147.  Dr. Weaver diagnosed Preston with fibromyalgia and noted that he was doing quite well on his medication.  Id.  She recommended that he continue his medication and begin a regular exercise program.  Id.

In 1998, Preston went to work as an advertising materials distributor.  AR 124.  In this job, Preston filled tourist brochure racks.  AR 43.  The job required Preston to drive about a thousand miles per week and lift heavy boxes.  AR 192.

On February 9, 2000, Preston attended a follow-up appointment with Dr. Finley regarding his fibromyalgia.  AR 167.  Preston indicated that he was doing quite well, and that exercises helped his symptoms.  Id.  Preston also stated that he could lift 50 pounds without aggravating his symptoms.  Id.  Preston indicated that his sleep was disturbed at night, that he snored, and that he often awakened out of breath.  Id.  Dr. Finley diagnosed Preston with fibromyalgia and indicated a possible diagnosis of sleep apnea.  Id.  Dr. Finley recommended a continuation of Preston's medication and a follow-up visit in six months.  Id.  A sleep study performed on March 13, 2000, verified that Preston was suffering from mild hypersomnia with obstructive sleep apnea syndrome.  AR 164.

On August 24, 2000, Preston had a follow-up with Dr. Finley.  AR 163.

Preston noted increased symptoms since May of 2000, and he noted that his

pain increased three days after lifting heavy objects.  Id.  Dr. Finley indicated

that Preston's fibromyalgia was stable on his current medication but he

increased Preston's level of Amitriptyline to 125 mg per day.  Id.  Dr. Finley

recommended a follow-up in six months.  Id.  Dr. Finley also recommended an

MRI of Preston's brain and cervical spine.  Id.  The MRI indicated that

Preston's "cerebellar tonsils are low lying and extend below the level of

foramen magnum approximately 5 mm."  AR 183.  The MRI also revealed a

herniated disk in Preston's back that "may be impinging on the anterior nerve

root at this level and may well be of significance."  AR 184.

On September 6, 2000, Preston was seen by Steven B. Schwartz, M.D.

AR 132-136.  Preston reported neck pain radiating into his arms and legs.  AR

132.   He indicated that the pain had existed for seven years and that it had

gotten worse.  Id.  Dr. Schwartz opined that Preston's symptoms might be

caused by a Chiari malformation (low-lying cerebellar tonsils) and

recommended surgery.  AR 135.  A second opinion by Edward L. Seljeskog,

M.D., suggested that neither the low-lying tonsils nor the herniated disk were

causing Preston's symptoms.  AR 145.

On February 27, 2001, Preston attended a follow-up visit with

Dr. Finley.  Preston reported that "he is doing ok," but he has increased

discomfort from lifting heavy objects.  AR 162.  Dr. Finley indicated that

4

Preston was stable on his medication.  Id.  He suggested that Preston continue his medication and have a follow-up visit in a year.  Id.

On February 18, 2002, Preston had another follow-up visit with Dr. Finley.  Preston reported "doing about the same," and he denied having any new problems.  AR 161.  Dr. Finley indicated that Preston's pain was present but under control with medication.  Dr. Finley recommended continued use of the medication and a follow-up in one year.  Id.

On February 4, 2003, Preston had his next follow-up visit with Dr. Finley.  Preston indicated that he was "getting along in a fairly stable fashion."  AR 160.  Preston did report some increased hand pain in September and October of 2002, and he stated that his symptoms got worse in the fall. Id.  Dr. Finley recommended Preston continue taking his medication and report for a follow-up in one year.

In June of 2003, Preston quit his job as an advertising materials distributor because his symptoms prevented him from doing the job.  AR 192. Preston then filed for disability insurance benefits on December 30, 2003, alleging a disability onset date of June 13, 2003.  AR 69.

On March 4, 2004, Preston attended a follow-up visit with Dr. Finley. Preston informed Dr. Finley that he stopped working last summer as a result of weakness in his arms, and that he was looking into several job opportunities.  AR 159.  Preston also reported that he gave up looking for fossils in his spare time.  He indicated that his medication was helping

significantly.  Dr. Finley diagnosed Preston with fibromyalgia that is stable on medication and recommended continuation of medication and yearly follow-ups.  Id.

On April 6, 2004, a consulting physician for South Dakota Disability Determination Services (DSS) reviewed Preston's medical records and completed a Residual Functional Capacity Assessment.  AR 168-75.  The consulting physician opined that Preston's residual functional capacity (RFC) enabled him to lift and carry 50 pounds occasionally and 25 pounds frequently, to stand for 6 hours in an 8-hour day, and to sit for 6 hours in an 8-hour day.  The physician also opined that Preston could frequently balance, stoop, kneel, crouch, and crawl, and that he had no manipulative limitations.

On June 9, 2004, Preston was seen by John J. Lassegard, M.D.  AR 178-79.  Preston reported that he was having lots of pain.  He indicated that he could not shave, shower, or dress himself without his Amitriptyline.  Dr. Lassegard's evaluation indicated tenderness on Preston's neck, deltoid, triceps, biceps, forearms, and along his spine.  AR 179.  Dr. Lassegard prescribed Neurontin and scheduled a follow-up for nine days later.  Preston returned on July 6, 2004, and he reported that the Neurontin was helping but causing unpleasant mood swings.  AR 177.  Preston eventually stopped taking Neurontin because of its side effects.  AR 192.

On August 4, 2004, Preston attended a consultive evaluation by licensed psychologist Roberta Kramlich.  AR 192-95.  Preston reported that

6

his pain limits him to 15 hours of sleep per week, and that he might go three days without sleep.  AR 193.  He also indicated that on a good day he drops 10 percent of everything he picks up and on a bad day he drops 50 percent of things.  Id.  He stated that his symptoms prevent him from engaging in his hobbies, working, cooking, vacuuming, and using a computer.  AR 194.  With his medication, he can shower, shave, and dress himself.  Id.  Kramlich diagnosed Preston as suffering from "depression and anxiety as it relates to how his medical conditions have made his life so painful and unfulfilling."  AR 195.  She indicated that Preston was entirely cooperative with the evaluation, that he wanted to work and be active, and that his medical conditions have changed his life.  Id.  Kramlich also noted that Preston became "visibly agitated as he talked about being unable to get medical care because of his lack of insurance."  AR 193.

On October 6, 2004, a consulting physician from DSS completed a second Residual Functional Capacity Assessment.  AR 216-23.  The physician opined that Preston could lift and carry 50 pounds occasionally and 25 pounds frequently, stand for 6 hours in an 8-hour day, and sit for 6 hours in an 8-hour day.  AR 217.  The consulting physician further opined that Preston could frequently balance, stoop, kneel, crouch, and crawl, and that he had no manipulative limitations.

On December 2, 2004, Preston was seen again by Dr. Weaver for an evaluation of his fibromyalgia.  AR 224.  Examination revealed no tenderness

along the paraspinous muscles or cervical spine but did indicate the presence of tender points.  AR 225.  A good range of motion was shown.  Id.  Dr. Weaver diagnosed Preston with fibromyalgia and completed a Fibromyalgia Residual Functional Questionnaire.  AR 227.  According to the questionnaire, Dr. Weaver indicated that Preston meets the American Rheumatological Association criteria for fibromyalgia, and that his symptoms included multiple tender points, nonrestorative sleep, chronic fatigue, depression, vestibular dysfunction, cognitive impairment, multiple trigger points, numbness and tingling, and Sicca symptoms.  Id.  Dr. Weaver opined that Preston's symptoms would constantly interfere with his attention and concentration, and that Preston would be unable to work because his symptoms would lead to more than 6 or more unscheduled absences per month.  AR 228-29.

On January 18, 2005, Preston had another follow-up visit with Dr. Finley.  AR 230.  Preston indicated he suffered from continued pain and difficulties sleeping.  He indicated that Amitriptyline helps somewhat.  Dr. Finley indicated that Preston's fibromyalgia is stable on medication "with perhaps some subtle fluctuation and degree of discomfort."  Id.  He recommended that Preston continue on his medication and return in a year for a follow-up.  Dr. Finley also agreed with Dr. Weaver that Preston should not work.

On November 29, 2005, Preston testified at an administrative hearing held before the ALJ.  AR 33-54.  Preston testified that he has constant pain in

his back and hands, that his leg suddenly becomes weak, and that he gets little sleep.  AR 36-37.  He testified that he can only eat with a spoon because he cannot use a fork and knife, that he needs help from his wife buttoning his clothes, and that he can only use a hand tool or a keyboard for a few minutes.  AR 38.  He indicated that he has difficulty washing his hair and shaving.  Id. Preston testified that he can walk up to thirty minutes on a good day, he can stand in one place for a minute or two, he can sit for fifteen minutes at a time, and he can safely lift less than five pounds.  AR 39.  Preston described his pain on the worst days as a ten on a one to ten scale.  AR 40.  He testified that he walks to get the mail every day but that he can no longer wash the dishes, vacuum the house, collect fossils and rocks, drive, or do outdoor chores.  AR 39-42.  Preston also testified that on a typical day his pain requires him to lie down every one to three hours for up to fifteen minutes at a time.  AR 42.

## ALJ DECISION

On December 27, 2005, the ALJ issued a decision denying Preston's application for benefits.  The ALJ applied the sequential five-step evaluation process[2] and held that Preston was not disabled.  At step one, the ALJ found

---

[2] The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden

that Preston had not engaged in substantial gainful activity after his alleged onset date. At step two, the ALJ found that Preston suffered from fibromyalgia, chronic fatigue, and heel spurs, which qualify as severe impairments as defined in the regulations. Continuing with step three, the ALJ concluded that none of Preston's severe impairments were of listing severity. The ALJ thus proceeded to step four and determined whether Preston's RFC permitted him to perform his past relevant work. The ALJ found that Preston's RFC enabled him to perform a full range of medium duty work, and thus, Preston could perform his past relevant work as an advertising materials distributor. As a result, the ALJ terminated the analysis at step four and concluded that Preston was not disabled.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole. See 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion. See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); see also McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Review by this court extends beyond a limited search for

shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. See Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  See Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006); Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000).

The court's role under section 405(g) is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence.  See Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  Furthermore, a reviewing court may not reverse the Commissioner's decision "'merely because substantial evidence would have supported an opposite decision.'"  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)); see also Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004).  The court must review the Commissioner's decision to determine if an error of law has been committed.  See Olson ex rel. Estate of Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo with deference given to the Commissioner's construction of the Social Security Act.  See Smith, 982 F.2d at 311; see also Olson ex rel. Estate of Olson, 170 F.3d at 824.  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  See Baker, 457 F.3d at 892.

## DISCUSSION

Preston alleges that the ALJ committed two reversible errors.  First, Preston contends that the ALJ erroneously discounted his subjective complaints of pain.  Second, Preston contends that the ALJ failed to give the proper weight to Dr. Weaver's opinions.

## I.     Subjective Complaints of Pain

Preston argues that the ALJ erred in determining that Preston's subjective complaints of pain were not fully credible.  The ALJ must determine the credibility of a claimant's subjective complaints of pain and fatigue according to the analytical framework developed in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  In determining the proper weight attributable to a claimant's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) the dosage, effectiveness and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004); see also Polaski, 739 F.3d at 1322.  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999).  The ALJ does not have to explicitly discuss each factor so long as the ALJ "acknowledges and considers those factors before discounting a claimant's subjective complaints." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).

12

The ALJ "may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). When discounting subjective complaints "the ALJ must make express credibility findings and explain the record inconsistencies that support those findings." Dolph v. Barnhart, 308 F.3d 876, 879 (8th Cir. 2002).

Preston argues that the ALJ failed to follow the Polaski framework. The court agrees. The ALJ neither cited Polaski nor acknowledged the appropriate factors. Instead, the ALJ relied upon the Tenth Circuit's decision in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987). AR 18. According to the ALJ's reading of Luna, the weight attributable to a claimant's subjective complaints is determined by considering "all relevant evidence, including the claimant's testimony, persistent attempts to treat pain, willingness to try any treatment prescribed, the combined effects of psychological and physical impairments, the claimant's daily activities, and the dosage, effectiveness, and side effects of medication, among other factors." AR 18. After noting these relevant factors, the ALJ discounted "the degree of pain and fatigue alleged" by Preston because "his subjective complaints do not comport with objective medical findings or the frequency and extent of his medical treatment." Id.

The ALJ's erred in relying on Tenth Circuit precedent rather than Polaski and its progeny. Preston, who resides in South Dakota, properly appealed his denial of benefits by filing a civil action in the United States District Court for the District of South Dakota. See 42 U.S.C. § 405(g). The

13

United States District Court for the District of South Dakota is located within the Eighth Circuit, not the Tenth Circuit. As a result, Eighth Circuit, not Tenth Circuit, case law applies to this case.

The court finds that the ALJ's failure to apply the Polaski framework requires remand. By relying on Luna, the ALJ failed to acknowledge four Polaski factors, namely Preston's work record; the duration, frequency, and intensity of his pain; any precipitating and aggravating factors; and any functional restrictions. Although the ALJ discusses some evidence relevant to these omitted factors, the court cannot determine from the ALJ's decision whether the ALJ specifically considered this evidence when determining the credibility of Preston's subjective complaints. By relying on Luna, the ALJ's analysis of Preston's subjective complaints was based upon the wrong legal standard, and thus, remand is necessary to enable the ALJ to apply the correct standard.

The Commissioner argues that the ALJ evaluated Preston's subjective complaints under 20 C.F.R. §§ 404.1529 and 416.929, both of which mirror the Polaski framework. The Eighth Circuit has held that an analysis under §§ 404.1529 and 416.929 largely mirrors the Polaski framework, and thus, an ALJ does not always commit reversible error by relying on those regulations rather than Polaski. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (noting that citation to Polaski is the practice preferred by the Eighth Circuit). In this case, however, the ALJ did not analyze Preston's subjective complaints

14

under §§ 404.1529 and 416.929.  Although the ALJ cited those regulations, he then described Luna as providing the proper factors used to evaluate Preston's subjective complaints.  Moreover, the Luna factors are different from those used to evaluate subjective complaints of pain under §§ 404.1529 and 416.929.  Compare Luna, 834 F.3d at 165-66, with 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In sum, the ALJ evaluated Preston's subjective complaints under an erroneous legal standard when the ALJ applied Tenth Circuit, rather than Eighth Circuit, case law.  This error of law requires remand for application of the correct standard.  On remand, the ALJ should also consider Preston's contention that his financial status prevented him from obtaining medical treatment more frequently.  See SSR 96-7p, 1996 WL 374186 (1996) (stating that the ALJ cannot draw an inference from a claimant's failure to obtain frequent medical treatment unless ALJ considers the claimant's explanation, including inability to afford treatment).

## II.   Dr. Weaver

Preston also argues that the ALJ erred in discounting Dr. Weaver's opinions contained in the Fibromyalgia Residual Functional Questionnaire. The ALJ discounted Dr. Weaver's opinion because the opinion was "based exclusively on the claimant's subjective complaints and limitations, which are unsupported by objective findings and frequency of the claimant's medical treatment."  The discounting of Dr. Weaver's opinion is thus predicated on the

15

lack of credibility attributable to Preston's subjective complaints.  As noted above, however, the ALJ used the wrong legal standard when determining the credibility of Preston's subjective complaints.  The ALJ's failure to follow the Polaski framework thus infects the ALJ's conclusion discounting Dr. Weaver's opinions, and this determination cannot stand.  As a result, on remand, the ALJ should, after properly determining the credibility of Preston's subjective complaints, determine the weight attributable to Dr. Weaver's opinion.  The ALJ also should consider Preston's contention that Dr. Weaver's testimony is entitled to additional weight because she has expertise in the treatment of fibromyalgia.  See 20 C.F.R. § 404.1527(d)(5) (indicating that the ALJ should generally give more weight to "the opinion of a specialist about medical issues related to his or her area of specialty").

## CONCLUSION

The ALJ improperly determined the weight attributable to both Dr. Weaver's opinion and Preston's subjective complaints of pain and fatigue. These errors were caused by the ALJ's failure to follow the Polaski framework. Although Preston seeks a remand with an order to award benefits, the court concludes that the proper remedy is to remand the case to permit the ALJ to properly determine the weight attributable to Preston's subjective complaints of pain according to the Polaski framework.

Based on the foregoing, it is hereby

16

ORDERED that this case is remanded to the Commissioner in accordance with 42 U.S.C. § 405(g).

Dated May 14, 2007.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE